**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | Case No.  2:05-cr-00138-PMP-GWF |
| | ) | |
| vs. | ) | **FINDINGS & RECOMMENDATIONS** |
| | ) | |
| DONTE LAMONT LOFTON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the Court on Defendant's Motion to Suppress (#23), filed on January 11, 2006; the Government's Response to Defendant's Motion To Suppress (#28), filed on January 23, 2006; and Defendant's Reply to Government's Response (#29), filed on January 27, 2006.  The Court conducted an evidentiary hearing in this matter on February 8, 2006.  The Court granted the parties permission to file supplemental briefs following the hearing.  Defendant filed his Supplemental Briefing Concerning Hearing on Defendant's Motion to Suppress and Request for Reconsideration of Various Court Rulings at Hearing on Motion (#33) on February 16, 2006.  The Government filed its Response to Defendant's Post-Hearing Brief on Motion to Suppress (#35 ) on February 23, 2006.

This case involves a warrantless search of Defendant Lofton's residence conducted by probation officers pursuant to a search condition in Defendant's conditions of supervised release.  The search was conducted after Defendant violated conditions of his supervised release, including home confinement, and after the probation officers received information from an informant that Defendant was seen with a firearm.  At the time of the search, Defendant was informed of his *Miranda* rights and

he invoked his right to remain silent and to consult with his attorney.   During the search, a handgun and ammunition were found.  Defendant was informed of the discovery of the handgun.  In response to this information, Defendant allegedly informed the probation officers that he wanted to make a statement.  A Bureau of Alcohol, Tobacco and Firearms (BATF) agent again read Defendant Lofton his Miranda rights.  Defendant acknowledged that he understood his rights and then made statements to the BATF agent.

Defendant Lofton was indicted on April 20, 2005 for Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  Defendant argues that the search violated the Fourth Amendment because the probation officers did not have reasonable suspicion that he was engaged in criminal activity.  Defendant also argues that the statements he allegedly made to the BATF agent should be suppressed because all further questioning of him should have ceased after he initially invoked his *Miranda* rights.

## **FACTS**

In September 1994, Defendant Donte Lamont Lofton pled guilty to armed bank robbery and aiding and abetting and was sentenced to a term of imprisonment of 112 months to run consecutive to the term of imprisonment previously imposed upon him in state court.  *Government Exhibit "1."*  The district court also placed the Defendant on supervised release for a term of five years upon his release from imprisonment.  Among the conditions imposed on Defendant were that he not commit another federal, state or local crime, that he not possess a firearm or destructive device, that he not possess any illegal controlled substances, that he not associate with any persons engaged in criminal activity and not associate with any person convicted of a felony unless granted permission to do so by the probation officer, and that he submit to drug testing as directed by his probation officer.  *Id., Judgment, Supervised Release Conditions.*

The conditions of Defendant's supervised release also provided that:

> 2.       Defendant shall submit to the search of his person, property, residence or automobile, without a search warrant, to ensure compliance with all conditions of release.

*Government Exhibit "1".*

. . .

Defendant Lofton was released from prison and commenced his term of supervised release on August 22, 2003.  United States Probation Officer Brian Simon was assigned to supervise Defendant during his supervised release.  Officer Simon testified that he met with Defendant Lofton on August 27, 2003 and reviewed the Judgment of Conviction and the conditions of supervised release with him.  Officer Simon testified that he had Defendant Lofton initialize each condition as it was reviewed and had Mr. Lofton sign the Judgment.  *See Government Exhibit "1."*  Officer Simon also provided Defendant Lofton with a one page document entitled "Instructions for Individuals With a Search Condition."  *Government Exhibit "2."*  This document advised Defendant that it was his responsibility to inform occupants of his household of the search condition and that his residence could be searched by officers of the United States Probation Office.  *Id.*  This instruction form was also signed by Defendant and Officer Simon on August 27, 2003.

Officer Simon testified that he was generally aware of the circumstances of the armed bank robbery for which Defendant was convicted in 1994 and that it was a violent bank robbery.  Officer Simon was aware through information provided by the Las Vegas Metropolitan Police Department ("Metro") gang unit that Defendant Lofton had been a member of a North Las Vegas gang, the Crips.  Officer Simon was also aware through Defendant's criminal history record that he had a prior conviction for drug trafficking, a few juvenile convictions, and that he also had numerous arrests that did not result in convictions.  Officer Simon also testified that when Defendant was arrested on the prior drug trafficking charge he was in possession of a firearm.  Defendant's criminal history record also indicated that he had been arrested, but not charged, in a homicide involving a firearm.  These convictions and arrests occurred prior to 1994 because Defendant was in prison from at least 1994 to August 2003.

Officer Simon testified that Defendant Lofton tested positive for marijuana use in March 2004 which was a violation of the condition that he not use illegal drugs.  Following this violation, Defendant agreed to a modification of the conditions of his supervised release which added the conditions that Defendant Lofton submit to substance abuse counseling, alcohol abstinence and perform forty (40) hours of community service.  *See Violation Report, Request for Modification of Release Conditions,* Case No. CR-S-94-020-LDG (#133), filed July 26, 2004.  Following the modification of the release

conditions in July 2004, Defendant failed to report for several drug tests.  Officer Simon  testified that on August 30, 2004 Defendant was placed on weekly reporting to the probation officer and that the Defendant also failed to report as required during five (5) weeks between August 30, 2004 and November 18, 2004.

Officer Simon testified that in late October 2004, he was notified by Metro gang unit detectives that on October 20, 2004 Defendant attended the funeral of a known gang member.  The funeral was also attended by other gang members, including persons convicted of felonies.  Defendant did not request permission from Officer Simon to attend this funeral.  On October 25, 2004, Defendant admitted to Officer Simon that he had attended this funeral and that he knew that gang members would be present.  Defendant informed Officer Simon that the deceased was his cousin.  Officer Simon considered this a violation of the terms of Defendant's supervised release that he not associate with persons involved in criminal activities and persons convicted of felonies.

Officer Simon testified that he and his supervisor, Jim Perdue, met with Defendant on November 22, 2004, and informed him that he would be afforded one last opportunity to comply with the conditions of his supervised release.  The probation officers proposed that Defendant agree to a modification of his supervision to include home confinement and electronic monitoring for a period of four months.  According to Officer Simon, Defendant refused to agree to the modification and stated that he wanted to go back to court and finish up his time.  Defendant was, thereupon placed on daily reporting and the Probation Office petitioned the court to revoke his supervised release.

In December 2004, the U.S. Probation Office filed a Petition on Probation and Supervised Release, Case No. CR-S-94-020-LDG (#139), which sought to revoke Defendant's supervised release. On January 18, 2005, Judge George conducted a revocation hearing during which Defendant admitted that he had violated the terms of his supervised release and waived his right to a hearing.  The court modified the conditions by ordering that Defendant be placed on  home confinement for a period of six (6) months with electronic monitoring. *Minutes of Court, January 18, 2005*, case number CR-S-94-020-LDG.  Officer Simon, who was present at the hearing, testified that the District Judge told Defendant Lofton that any violation of the conditions of his supervised release would result in his being brought before the court and that the maximum sanction for violation would be imposed on him.

4

Officer Simon testified that under the terms of Defendant Lofton's supervised release as modified by Judge George on January 18, 2005, Defendant Lofton was confined to his home, except for purposes of going to and coming from work.  The electronic monitoring device worn by the Defendant was connected to a global positioning satellite system (GPS) which permitted the probation office to determine whether Defendant was at his residence as required by the January 18, 2005 order. The electronic monitoring system also allowed the probation office to track Defendant's movement away from his residence and, when functioning properly, permitted the probation office to determine Defendant's movements and location at any given time.

Officer Simon testified that Defendant's electronic monitoring system was not working on March 18, 2005.  Another probation officer, Ben Johnson, went to Defendant's residence on the afternoon of March 19, 2005 and replaced the electronic monitoring system and it thereafter functioned properly.  At that time, Defendant Lofton was employed by a company, Premier Staffing, to hand out advertising fliers.  According to Officer Simon, Defendant informed Officer Johnson that he would be working for Premier Staffing that weekend, March 19-20, and would be handing out advertising fliers at hotels on the Las Vegas Strip.  Under the terms of his home confinement, Defendant was authorized to leave his residence on those dates to perform his employment by handing out flyers on the Las Vegas Strip which is located in the southern part of the Las Vegas metropolitan area.

Defendant's residence was located in the area of Gowan Avenue between Valley View and Decatur Boulevards in the northwest part of the Las Vegas metropolitan area. Officer Simon testified that electronic monitoring records, which were admitted into evidence as *Government Exhibit "3,"* showed that on the evening of March 19, 2005, between approximately 6:40 p.m. and 8:00 p.m., Defendant Lofton left his residence and went to a location near the intersection of Lake Mead Boulevard and north Jones Boulevard, a few miles west of where Defendant resided.  This location would generally be in an opposite direction from Plaintiff's residence and the Las Vegas Strip.  Defendant returned to his residence at approximately 8:09 p.m.  The electronic monitoring/tracking information showed that Defendant again left his residence at approximately 8:20 p.m. and traveled several miles east of where he resides to a location near Interstate 15 and north of Cheyenne Avenue in North Las Vegas, Nevada.  From there, Defendant traveled to another location further east in North

Las Vegas.  Defendant did not return to his residence until approximately 12:21 a.m. on the morning of March 20, 2005.  Again, these locations are not in the vicinity of the Las Vegas Strip.  The electronic monitoring tracking information also showed that in the early evening hours of March 20, 2005 Defendant left his residence and went to locations in "West Las Vegas" which is located a few miles northwest of downtown Las Vegas and is not in the vicinity of the Las Vegas Strip where the Defendant stated he would be handing out advertising flyers.

Officer Simon testified that he, probation officer Johnson, and probation supervisor Jim Perdue interviewed Defendant Lofton on March 21, 2005, and showed him the electronic monitoring/tracking information depicting his movements on March 19th and 20th.   Defendant maintained that he was working on the Las Vegas Strip on those days and Defendant could not explain why the electronic tracking information showed him to be in other areas "nowhere near the Strip."  Officer Simon believed, but was not sure, that he informed Defendant Lofton on March 21, 2005 that based on his violations of the home confinement condition, the Probation Office was "going back to court."

Officer Simon testified that on March 21st or 22nd, he was getting ready to prepare a petition to revoke Defendant's supervised release.  On March 22, 2005, however, Officer Simon's supervisor, Jim Perdue, informed him that on March 19, 2005 a confidential informant had told Mr. Perdue that Defendant was seen with a firearm on March 18, 2006.  As reported by Mr. Perdue, the confidential informant did not personally observe Defendant Lofton with a firearm but reported that another person had told the informant that Mr. Lofton had brandished a firearm on that date at Doolittle Park. Because Defendant's electronic monitoring device was not operating on March 18, 2005, the probation office could not determine whether Defendant was at or near the location where he was reportedly seen with a firearm.

Officer Simon testified that based on the information provided by the informant, Mr. Perdue told him that Defendant's residence should be searched and the probation officers decided to search Defendant's residence prior to filing a petition to revoke his supervised release.   Officer Simon testified that the decision to conduct a search was based on the information received from the informant combined with Defendant's previous violations of the conditions of his supervised release, his recent violations of the home confinement condition on March 19th and 20th, and his prior criminal

1  history which included armed bank robbery, drug trafficking, and gang involvement.   Officer Simon

2  testified that in light of the foregoing information, the probation office would have been remiss if it did

3  not invoke the search condition for officer safety and community safety.

4         The search was conducted on March 24, 2005, three days after Mr. Perdue informed Officer

5  Simon about the information received from the informant.  The search of Defendant's residence

6  commenced at approximately 4:30 p.m.  Supervising probation officer Pat Foy was the policy advisor

7  for the search.  He testified that the search coordinator, Officer Robert Aquino, informed the North Las

8  Vegas Police Department that the search was being conducted as routine notification that a probation

9  office search would be occurring in their jurisdiction.  Officer Foy testified that uniformed North Las

10  Vegas police were in the area of Defendant's residence as the search commenced, but did not enter

11  Defendant's residence with the six probation officers conducting the search.  Officer Foy believes that

12  North Las Vegas police officers entered the residence after probation officers found controlled

13  substances in the house.  Officer Foy testified that upon entering Defendant's residence, Officer Simon

14  and another probation officer took charge of Defendant Lofton.  The other officers fanned out through

15  the residence to locate other persons and to secure the premises.

16         Officer Simon testified that upon entering Defendant Lofton's residence he placed the

17  Defendant in handcuffs and informed him of his rights under *Miranda,* including his right to remain

18  silent and to consult with counsel.  Defendant stated he did not want to make any statement at that time

19  and wanted his attorney to be contacted.  Officer Simon testified that he did not ask Defendant any

20  questions, but informed him that the officers were there to invoke the search condition as they had

21  received information that there was possibly a gun in the residence.  Officer Foy was aware that

22  Defendant had invoked his *Miranda* rights and testified that he attempted to contact Defendant's

23  attorney by telephone.  Apparently due to the lateness of the day, Defendant's counsel was unavailable.

24  Officer Foy testified that he left Defendant's counsel a voicemail message, but did not hear back from

25  him during the search.

26         Officer Foy testified that during the search, two BB guns were discovered.  He testified that

27  one of the BB guns closely resembled a firearm and that Defendant stated that they were just toys and

28  belonged to the kids.  Officer Foy testified that approximately 30 minutes into the search, a firearm was

discovered in the residence.  A North Las Vegas police sergeant came into the room where Defendant was detained.  Officer Foy testified that this police officer apparently knew Defendant through the police officer's service on the police gang unit.  The police officer asked the Defendant if he remembered him.  Officer Foy testified that Defendant responded to the police officer and stated that he remembered who he was.   Officer Foy testified that the police sergeant stated to Defendant Lofton that a firearm had been found in the residence.  According to Officer Foy, the police sergeant either stated: "Oh, so you got a gun here?" or said  "A gun was located here."  There is no evidence that Defendant directly responded to this statement by the police sergeant.  Officer Foy also stated that none of the probation officers who were present asked Defendant any questions.

Shortly after the interaction with the North Las Vegas police sergeant,  Defendant told Officer Foy that he wanted to speak to whomever was in charge of the search.  Officer Foy contacted Probation Officer Robert Aquino and told him that Defendant wanted to speak to him.  Officer Foy stated that he also reminded Officer Aquino that Defendant had previously invoked his *Miranda* rights. According to Officer Foy, Officer Aquino came to where Defendant was located.  Officer Foy recalled that Defendant told Officer Aquino that he "wanted to make a deal."  According to Officer Foy, Officer Aquino told Defendant that he was not going to talk to him because he had invoked his rights.  Officer Aquino told Defendant that he would have one of the BATF agents, who had come to the residence following discovery of the firearm, speak with him.  According to Officer Foy, the BATF agents were then summoned to where Defendant was located and read Defendant's *Miranda* rights to him.

Officer Robert Aquino, who was the search coordinator, testified that sometime during the search Officer Foy informed him that Defendant wanted to speak to the person in charge of the search. Officer Aquino testified that he was informed that Defendant changed his mind about making a statement after a North Las Vegas police officer made a statement in Defendant's presence that a gun had been found in the residence.  In contrast to Officer Foy, Officer Aquino testified that the police officers were speaking among themselves and the police officer's comment about finding a gun was not directed to the Defendant.

According to Officer Aquino, he approached Defendant, identified himself and told the Defendant that because he had invoked his *Miranda* rights, Officer Aquino would not ask him any

8

questions.  Defendant asked Officer Aquino if he was the person in charge and stated that he wanted to make a statement regarding what was going on in the search.  Defendant told Officer Aquino that he was willing to answer the officer's questions if they wanted to ask them.  Officer Aquino apparently again informed Defendant that he would not ask him questions because he had invoked his rights.  Officer Aquino testified that he told Defendant that if he wanted to make any statement, he could speak with the BATF agents who were present in response to being notified about the discovery of the firearm.  Officer Aquino then introduced Defendant to the BATF agents.  Officer Aquino testified that he observed the BATF agent read the *Miranda* warnings to the Defendant.  Officer Aquino thereupon left the room to give them privacy.

BATF Agent Doak Dyer testified that he responded to a call from Officer Aquino that a firearm had been located during a probation search of Defendant's residence.  Upon arrival the BATF agents were shown the firearm which was located in another part of the residence from where Defendant was detained.  According to Agent Dyer, Officer Aquino then informed him that Defendant was willing to talk to the BATF agents.  Agent Dyer testified that he went to where Defendant was being detained and asked the Defendant if it was true that the Defendant wanted to talk to him.  Defendant said yes.  Agent Dyer read Defendant the *Miranda* warnings from an Advice and Waiver form that was admitted into evidence as *Government Exhibit "4."*  Although the waiver form had places for the person's signature and a witness's signature, Agent Dyer did not have Defendant execute the waiver of rights portion of the form because Defendant was still in handcuffs.  Agent Dyer did not request that Defendant's handcuffs be removed so that he could sign the form.  Instead, Agent Dyer simply wrote the date and time at which he read the rights to Defendant.  Agent Dyer testified that Defendant then proceeded to make a statement to him.  No testimony was introduced regarding the substance of the statement made by Defendant.  According to Defendant's Motion to Suppress (#23), page 2, Defendant allegedly told the officers that he knew the gun was in the home and on one occasion he had removed it.  Defendant also allegedly told the officers that the gun belonged to his girlfriend and that she carried it for protection when they go out.

. . .

. . .

9

1

### DISCUSSION

2

The Fourth Amendment secures "the right of the people to be secure in their persons, houses,

3

papers and effects against unreasonable searches and seizures." U.S. Const. Amend. IV. The Fourth

4

Amendment protects reasonable and legitimate expectations of privacy. *Katz v. United States*, 389

5

U.S. 347 (1967). Evidence obtained in violation of the Fourth Amendment, and evidence derived from

6

it, may be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471

7

(1963).

8

**1.     The Search Was Supported By Reasonable Suspicion that Defendant Was Engaged in Criminal Activity.**

9

10

Although the Fourth Amendment generally requires that a search be made pursuant to a

11

warrant issued by a magistrate on a finding of probable cause, searches of probationers or parolees

12

pursuant to a search provision in their conditions of supervised release may be conducted without a

13

search warrant and do not require a showing greater than reasonable suspicion that the individual is

14

engaged in criminal activity. *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3166 (1987); *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587 (2001).[1]

15

16

In *Griffin v. Wisconsin, supra,* the defendant, who had a felony conviction, was convicted and

17

placed on probation for resisting arrest, disorderly conduct, and obstructing a police officer. A state

18

regulation permitted any probation officer to search a probationer's residence without a warrant so

19

long as the probation officer's supervisor approved and there were reasonable grounds to believe that

20

contraband was present. The probation supervisor received information from a police detective that

21

there were or might be guns in defendant's residence. Probation officers and the police searched

22

23

[1]The constitutionality of a "suspicionless" search of a parolee was left open by the Supreme Court's decision in *United States v. Knights*, 534 U.S. 112, 120, n. 6, 122 S.Ct. 587, 592 n. 6 (2001). The Supreme Court has granted certiorari on the issue of whether a suspicionless search  pursuant to an express probation condition which grants authority to conduct such searches violates the Fourth Amendment. *See Samson v. California*, —U.S.—, 126 S.Ct. 34, 162 L.Ed. 2d 933 (2005), discussed in *Motley v. Parks*, 432 F.3d 1072 (9th Cir. 2005). For purposes of this Report, the Court assumes that the Fourth Amendment requires that searches of probationers or supervised releasees be based on reasonable suspicion that the person is engaged in criminal activity. In addition, the conditions of Defendant Lofton's supervised release did not expressly authorize the probation officers to conduct searches without reasonable suspicion or reasonable cause.

24

25

26

27

28

defendant's residence and found a handgun.  Defendant was subsequently charged with possession of a firearm by a convicted felon.   The Supreme Court held that the search of defendant's residence "satisfied the demands of the Fourth Amendment because it was carried out pursuant to a regulation that itself satisfies the Fourth Amendment's reasonableness requirement under well established principles."  *Id.*, 483 U.S., at 873.

*Griffin* stated that although the Fourth Amendment usually requires that searches be undertaken only pursuant to a warrant supported by probable cause, a state's operation of a probation system presents special needs beyond normal law enforcement that justifies departure from the usual warrant and probable cause requirements.  The Court noted that probation, like incarceration, is a form of criminal sanction.  Probation itself can be more or less confining depending on the number and severity of restrictions imposed.   The Court further noted that probationers and parolees, to a greater or lesser degree, depending on conditions imposed on them, do not enjoy "'the absolute liberty to which every citizen is entitled, but only . . .  conditional liberty properly dependent on observance of special [probation] restrictions.'  *Morrissey v. Brewer,* 408 U.S. 471, 480, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).  *Id.,* 483 U.S., at 874."

*Griffin* further noted that "the unauthenticated tip of a police officer — bearing, as far as the record shows, no indication whether its basis was firsthand knowledge, or, if not, whether the firsthand source was reliable, and merely stating that Griffin 'had or might have' guns in his residence, not that he certainly had them" would not likely meet the requirement of probable cause.   The Court held, however, that an informant's tip provided by a police officer was sufficient to support reasonable suspicion under the probation search condition.  The Court stated that probation officers are entitled to consider factors other than what a police officer or magistrate would consider in assessing the reliability and motivation of an informant.  Citing state probation regulations, the Court stated that probation officers may also consider "information provided by the client which is relevant to whether the client possesses contraband," and "[t]he experience of a staff member with that client or in a similar circumstance."  The Court stated: "we deal with a situation in which there is an ongoing supervisory relationship – and one that is not, or at least not entirely adversarial – between the object of the search and the decisionmaker."  The Court further stated:

In such circumstances it is both unrealistic and destructive of the whole object of the continuing probation relationship to insist upon the same degree of demonstrable reliability of particular items of supporting data, and upon the same degree of certainty of violation, as is required in other contexts.   In some cases-especially those involving drugs or illegal weapons-the probation agency must be able to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene before a probationer does damage to himself or society.   The agency, moreover, must be able to proceed on the basis of its entire experience with the probationer, and to assess probabilities in the light of its knowledge of his life, character, and circumstances.

*Griffin, supra,* 483 U.S., at 878-879.

In *United States v. Knights*, 534 U.S. 112, 120-121, 122 S.Ct. 587 (2001), the Court held that the search of a probationer based on reasonable suspicion did not violate the Fourth Amendment even though neither the probation order nor any state regulation required that the probation officer have reasonable suspicion to justify a search.  *Knights* also held that the Fourth Amendment does not limit the purposes of such probation searches solely to the purpose of determining whether a probationer is complying with the conditions of his probation.  The Court noted that the "very assumption of the institution of probation" is that the probationer is more likely than the ordinary citizen to violate the law,  *Knights, supra,* 534 U.S., at 120, and that a search may be conducted both for the purpose of determining whether the probationer is complying with the probation conditions and also to search for evidence of criminal activity.  Thus, it was not improper for a police officer, who was aware of the search provision in defendant's parole conditions, to search his residence for evidence of criminal activity where the search was supported by reasonable suspicion.[2]

Clearly, where probation authorities receive credible information from a reliable informant, the tip itself may supply reasonable suspicion that a person is engaged in criminal activity.  In *United States*

---

[2]Probation Officer Pat Foy, who authorized the search of Defendant's residence in this case, testified that the North Las Vegas Police Department was notified as a matter of routine that the probation officers would be conducting a search in their jurisdiction.  Defendant suggested that the probation search may have been a "stalking horse" for what in reality was a criminal investigation. Although Officer Foy disputed this suggestion, even if the probation search was also conducted in conjunction with local enforcement officers for criminal investigative purposes, this would not render the search invalid under the Fourth Amendment so long as it was supported by reasonable suspicion. *United States v. Knights*, *supra; United States v. Stokes*, 292 F.3d 964, 967 (9th Cir. 2002)*; United States v. Tucker*, 305 F. 3d 1193, 1199-1200 (10th Cir. 2002).

1   *v. Hagenow,* 423 F.3d 638 (7th Cir. 2005), for example, the court held that information provided by a

2   known reliable informant who personally observed defendant, a probationer, with a firearm in his

3   possession was sufficient to give the probation officer reasonable suspicion to conduct a search of the

4   probationer's residence.  In *United States v. Tucker*, 305 F.3d 1193 (10th Cir. 2002), the informant

5   advised the police that the defendant who was on probation for child sexual abuse had child

6   pornography on his home computer.  The informant was known to the officer as having previously

7   been employed by the Bureau of Reclamation and the U.S. Attorney's office.  The information she

8   provided, however, was based on second and third hand information provided by two anonymous

9   persons.  In upholding the validity of the search based on reasonable suspicion, the court stated:

10              Tucker contends that something more than an anonymous tip of
11   illegal activity is required to provide reasonable suspicion.  Tucker's
     general proposition is correct.  *See Florida v. J.L.,* 529 U.S. 266, 270,
     120 S.Ct. 1375, 146 L.Ed.2d 254 (2000);  *White,* 496 U.S. at 329, 110
12   S.Ct. 2412.  Groneman was not an anonymous informant, however.
     While her sources remained anonymous, Groneman was known and
13   could be "held responsible if her allegations turn[ed] out to be
     fabricated."  *J.L.,* 529 U.S. at 270, 120 S.Ct. 1375.  Such
14   citizen-informants are presumed to be reliable.  *See J.B. v. Washington
     County,* 127 F.3d 919, 930 (10th Cir.1997).  Moreover, friend 2 was not
15   completely anonymous.  Groneman confided in Atack that friend 2 was a
     co-worker of Tucker's.

16              Additionally, there was information contained in the tip about
17   the basis of Groneman's knowledge.  Groneman explained that she had
     been told by friend 1 that friend 2, a co-worker of Groneman's at
18   Reclamation, had visited Tucker's house for lunch during a break from a
     training session or seminar and saw child pornography on his computer.
19   Moreover, the tip was detailed and related the circumstances under
     which friend 2 was in Tucker's apartment, that Tucker possessed a
20   computer containing child pornography, and Tucker's statements
     regarding his attraction to young girls.  Such detail indicates that friend
21   2's statement, through Groneman, was reliable.  *Cf. United States v.
     Tuter,* 240 F.3d 1292, 1298 (10th Cir. 2001).

22

23       *Tucker* further noted that the informant's knowledge was permissibly based on hearsay.  *Citing*

24   *United States v. Gonzales,* 897 F.2d 504, 507 (10th Cir.1990) ("The informant's knowledge may be

25   based on hearsay or even double hearsay.").

26       Even less reliable informant information may also contribute to a finding of reasonable suspicion

27   where there is other evidence or information that defendant is likely engaging in criminal activity.  In

28   *United States v. Giannetta*, 909 F.2d 571 (1st Cir. 1990), a probation officer had gathered substantial

13

1   information that defendant had violated his probation conditions and was engaging in illegal fraudulent

2   conduct.  The officer had also "received informant information that Giannetta had been seen in Florida

3   (unauthorized travel) and always carried a gun (illegal for a felon)."  *Id.,* at 573.  The court did not

4   otherwise describe the informant or state whether the information was based on the firsthand

5   observations of the informant.  The court held that the officer had reasonable suspicion to justify a

6   search independent of the information provided by the informant.  The court, however, citing *Griffin,*

7   also indicated that the informant information was a factor that supported reasonable suspicion.

8   Discussing *Griffin,* the court stated:

9           More particularly, the Court has held that information received from a
            police detective that there "were or might be guns" in a probationer's

10          apartment was sufficient to furnish reasonable grounds to search even
            though there was no indication whether the tip was based on the

11          detective's firsthand knowledge, or if not, whether the source was
            reliable.  *See Griffin*, 483 U.S. at 871, 878-80, 107 S.Ct. At 3166, 3170-

12          71.

13          As *Griffin* instructs, in determining whether a probation officer had reasonable suspicion to

14   conduct a search of a probationer's residence, the court must consider the totality of the circumstances.

15   Other cases demonstrate the totality of the circumstances approach involving searches of probationers

16   or parolees.  In *United States v. Stokes*, 292 F.3d 964, 967-68 (9th Cir. 2002), the court held that there

17   was reasonable suspicion to search a probationer's vehicle based on the following evidence: A co-

18   worker of the defendant showed defendant two guns that the co-worker had in his car.  Later that day,

19   the co-worker looked out the window and saw defendant putting something into the trunk of

20   defendant's car and heard the sound of metal hitting metal.  When the co-worker went to his car after

21   work, he discovered that the guns were missing.  The following day, a convenience store reported that

22   someone was sleeping in a car in the parking lot.  The police officer who responded to the seen,

23   encountered defendant who was returning to his car.  Defendant admitted that he had been drinking.

24   The officer called defendant's probation officer who came to the scene, searched the car and found one

25   of the guns stolen from defendant's co-worker.  Based on the totality of the circumstances, the court

26   held that there was reasonable suspicion to search the vehicle, with defendant's probation search

27   condition being a salient factor.  The court further stated:

28   . . .

The standard of reasonable suspicion was clearly met.  Hayes had informed the  police that he had shown the guns to Stokes and had seen Stokes place something in the trunk of his car.  Stokes was sufficiently identified to the officer, who knew him and knew of Stokes' history of theft.  All of this was known to the probation officer, Blazer, when he searched Stokes' vehicle, as was the fact that Stokes had been drinking.

In *United States v. Keith*, 375 F.3d 346 (5th Cir. 2004), the defendant was on probation for a conviction of possessing destructive devices arising out of his having constructed and planted homemade explosive devices in his school.  A building supply retailer who was aware of defendant's prior conviction reported to law enforcement authorities that defendant had purchased pipes and end-caps which could be used to make pipe bombs.  The court noted that this information, viewed in isolation, would not be suspicious, but when combined with the knowledge of the defendant's prior conviction, constituted reasonable suspicion that he was engaged in criminal activity.  *See also United States v. Arviso*, 534 U.S. 266, 273-274, 122 S.Ct. 744 (2002), in which the Court states the particular objective facts on which an officer based his suspicions must be viewed in their totality as to whether they contribute to a finding of reasonable suspicion.  Conduct or behavior that might be viewed as innocent or innocuous in one set of circumstances may be suspicious in the context of other circumstances.

In this case, Defendant Lofton argues that the probation officers did not have reasonable suspicion to search his residence because the information provided by the informant was not shown to be reliable and was based on double hearsay.  Although an informant's knowledge may be based on hearsay or even double hearsay, *United States v. Tucker, supra,* the Court agrees that the informant in this case, although known to the probation officers, was not shown to be a reliable informant who had previously provided credible information.  The informant also did not personally observe Defendant Lofton with a handgun, but instead reported that a third person had seen Defendant with a firearm on March 18, 2005.  No other details were provided regarding the circumstances of the third person's observations which would indicate that the information was inherently reliable.  Because Defendant's electronic monitoring system was not operating on March 18, 2005, the probation office could not independently determine whether Defendant was in the area where he was reportedly seen with a

firearm.[3]  The Court, therefore, concludes that the informant and the information he or she provided have not been shown to be reliable.  The informant information in this case is also arguably distinguishable from *Griffin* because it was not provided by a police officer – which might provide some indicia of reliability.  On the other hand, the fact that an unreliable informant's tip is passed along to probation authorities by a police officer does not convert it into a reliable tip.

Although the informant information in this case was probably not sufficient, in and of itself, to justify a search of Defendant's residence, there were a number of facts and circumstances known to the probation officers that, when considered in their totality, gave rise to reasonable suspicion that Defendant was engaged in criminal activity immediately prior to the search of his residence on March 24, 2005.  Defendant was released from prison in August 2003 after serving a lengthy prison term for armed bank robbery.  His pre-imprisonment criminal record also included a conviction for drug trafficking, and he had numerous other arrests, including an arrest involving a homicide.  Plaintiff had also been a gang member.  The crime for which Defendant was convicted and his criminal history record were no doubt the basis upon which the Court in 1994 imposed the search condition upon his supervised release.  Defendant was imprisoned for the next 9 years.  While the information about Defendant's criminal history was more than 10 years old at the time of the search, given the fact that he was imprisoned during the intervening time period, his past criminal history was clearly relevant to the probation officers' assessment of the risks he posed as a supervised releasee upon his release from prison.  It is reasonable to conclude that Defendant was a person who would be subject to close and careful probation supervision to ensure that he complied with the conditions and did not again engage in criminal activity.

Upon his release from imprisonment, the probation officer met with Defendant and reviewed each of the conditions of his supervised release, including the search condition.  Defendant was clearly

---

[3]In its Response to Defendant's Motion to Suppress (#28), at pages 9-10, the Government erroneously argued that the informant's statement was corroborated by the electronic monitoring tracking information that showed Defendant to be away from his residence on that date.  Officer Simon's hearing testimony clearly established, however, that Defendant's electronic monitoring system was not operating on March 18, 2005.

aware of the conditions of his supervised release and the search condition to which he was subject. Officer Simon's testimony establishes that in the year prior to the search of Defendant's residence on March 24, 2005, Defendant repeatedly failed to comply with the conditions of his supervised release. In March 2004, Defendant violated the condition of his release that he not possess illegal drugs. Between July 26, 2004 and November 22, 2004, Defendant further violated the terms of his supervised release by repeatedly failing to report for drug testing and failing to report weekly to his probation officer. In October 2004, Defendant further violated the terms of his supervised release by attending the funeral of a known gang member at which he knew other gang members and persons convicted of felonies would be present. These circumstances reasonably indicated that Defendant was not complying with the conditions of his supervised release and by November 2004 would reasonably have led the probation officers to suspect that Defendant might be engaging in criminal activity.

Because of these violations, the Court placed Defendant on additional and more restrictive conditions of supervised release in January 2005 – home confinement and electronic monitoring. These conditions further restricted Defendant's liberty and his expectation of privacy. As Officer Simon testified, the District Judge also made clear to Defendant when these additional conditions and restrictions were imposed, that any further violations would result in the maximum penalty for violations being imposed on him. Defendant thereafter violated the additional conditions of his supervised release on March 19th and 20th by leaving his residence and traveling outside the area where he was authorized to be.

The tracking information also indicated that Defendant went to places and at times where it would not be likely that he would be handing out advertising flyers for his employer. Furthermore, upon being interviewed by the probation officers, Defendant denied that he had been at the locations indicated on the tracking records. Defendant failed to provide the officers with any information that would reasonably explain his movements on those dates which were in violation of the conditions of home confinement. These circumstances, combined with Defendant's previous violations, provided objectively reasonable suspicion that Defendant Lofton was engaging in criminal activity.

Therefore, the information known to the probation officers on March 21, 2005, even absent the informant information, was sufficient to give rise to reasonable suspicion to justify a search of

Defendant's residence.  Officer Simon testified that on March 21 and 22, 2005, he was intending to prepare another petition to revoke Defendant's supervised release and was not, at that point, contemplating seeking authorization to search Defendant's residence.   Officer Simon's testimony clearly indicates that it was the supervising officer's receipt of the informant information that Defendant had been seen with a firearm on March 18, 2005, and the probation officers' subsequent discussion of that information, which led to their decision to first conduct a search of Defendant Lofton's residence. Although the informant information, standing alone, may not have justified a search of Defendant Lofton's residence, that additional information, in light of what the probation officers already knew about Defendant's conduct, constituted reasonable suspicion that Defendant was engaged in criminal activity and that there was a reasonable likelihood that he was in possession of a firearm or other contraband.

During cross-examination of Officer Simon and Probation Officer Aquino, who prepared the post-search report regarding the search of Defendant's residence, Defendant's counsel established that the only reason for the search stated in the report was that information was received from an informant that Defendant was seen with a gun on March 18, 2005.  Defendant's counsel argues that this information was the only reason for conducting the search and the other facts and circumstances discussed above are simply a "smoke screen" and are irrelevant to whether the search was supported by reasonable suspicion.  The Court cannot agree with this argument.

Although the informant's tip was apparently the motivating reason for proceeding with the search, Officer Simon testified that Defendant's preceding violations and his violation of the home confinement condition were also the basis upon which the decision to conduct a search was made.  It does not appear reasonable or likely that the probation officers would have ignored Defendant's continuing failure to comply with the conditions of his release, including his violations of the home confinement conditions on March 19th and 20th and his failure to satisfactorily explain his movements on those dates.  Furthermore, the Court is required to consider whether there were objective facts known to the probation officers prior to the search which would support reasonable suspicion regardless of what the officer's subjective purposes were in deciding to conduct a search.  *Whren v. United States*, 517 U.S. 806, 812-13 (1996).  Clearly, the evidence in this case supports a finding of

18

1    reasonable suspicion that Defendant was engaging in criminal activity based on his violations of his
2    conditions of supervised release.

3         **2.    Denial of Defendant's Motion to Compel  Disclosure of Probation
              Chronological Reports Prior to the Hearing on Motion to Suppress (#30)
4             And the Court's Rulings Limiting Defendant's Cross-Examination of
              Probation Officer Regarding Informant.**

5         On February 3, 2006, five (5) days prior to the evidentiary hearing in this matter, Defendant
6    filed a *Motion to Compel Disclosure of Probation Chronological Reports Prior to the Hearing on*
7    *Motion to Suppress (#30)* seeking production of probation records regarding the informant who
8    allegedly saw Defendant with a firearm on March 18, 2006.  The Government opposed Defendant's
9    Motion on the grounds that Defendant was not entitled to discover the identity of the confidential
10   informant and that disclosure of the informant's identity could endanger his or her safety. The
11   Government also argued that Defendant was not entitled to production of the Probation Office records
12   and reports other than those filed with the Court.  *Government's Response (#31).*

13        Prior to the commencement of the evidentiary hearing, the Court conducted an *in camera*
14   examination of Probation Officer Simon and reviewed his chronological notes to determine whether the
15   informant existed and whether the informant was sufficiently reliable to support a finding of reasonable
16   suspicion or probable cause to believe that Defendant Lofton was in possession of a firearm on March
17   18, 2005.

18        In *United States v. Fixen*, 780 F.2d 1434, 1439-40 (9th Cir. 1986), the Court affirmed the
19   district court's denial of defendant's motion to compel disclosure of an informant's identity prior to the
20   ruling on defendant's motion to suppress.  The court noted that under *Roviaro v. United States,* 353
21   U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the informer's privilege must give way where the
22   disclosure of the informant's identity "is relevant and helpful to the defense of an accused, or is
23   essential to a fair determination of a cause."  The burden is on the defendant to demonstrate the need
24   for the disclosure.  *Alexander,* 761 F.2d at 1303;  *United States v. Kelly,* 449 F.2d 329, 330 (9th
25   Cir.1971).  The court also stated that "[i]t is well-settled, however, that 'a trial court need not require
26   federal agents to disclose the identity of a reliable informant where the sole ground for seeking that
27   information is to establish the existence of probable cause for arrest.'  *United States v. Mehciz,* 437

28                                        19

1   F.2d 145, 149 (9th Cir.), *cert. denied,* 402 U.S. 974, 91 S.Ct. 1663, 29 L.Ed.2d 139 (1971)."   The

2   court also stated that where a legitimate issue is raised regarding the existence or reliability of an

3   informant, the court may conduct an *in camera* examination.   *Fixen* states:

> The *in camera* procedure provides an equally-acceptable accommodation of the competing interests of the Government and the accused in the situation presented here, wherein the question is whether a law enforcement officer has lied.   Through disclosure of the informer's identity to the trial judge, and such subsequent inquiries by the judge as may be necessary, the Government can be protected  from any significant, unnecessary impairment of secrecy, yet the defendant can be saved from what could be serious police misconduct.

9   *Id., see also United States v. Johns*, 948 F.2d 599, 606 (9th Cir. 1991).

10      Pursuant to *Fixen*, the Court conducted an *in camera* examination of Probation Officer Simon

11   to determine the existence and reliability of the informant and whether disclosure of the informant's

12   identity could expose him or her to danger.   Based on its *in camera* examination of Probation Officer

13   Simon and his reports and records, the Court concluded that the informant's identity should not be

14   disclosed for safety reasons.

15      Defendant argues that the Court improperly limited the scope of his cross examination of

16   Officer Simon because he was only seeking to test the reliability of the informant information and was

17   not seeking disclosure of his or her identity.   The Court, however, was required to balance Defendant's

18   right to test the reliability of the informant against the likelihood that such questioning would inevitably

19   reveal the informant's identity by narrowing the scope of likely informants.   The Court, therefore,

20   limited the scope of Defendant's cross-examination regarding the informant to prevent the disclosure of

21   his or her identity.   Officer Simon's hearing testimony established that the informant is not a person

22   who has provided reliable information in the past to the probation officers and that the informant did

23   not personally observe Defendant with a firearm on March 18, 2005.   Based on the hearing testimony,

24   as well as its own *in camera* examination, the Court does not find that the informant or the information

25   he or she provided was reliable or, standing alone, would have provided reasonable suspicion to search

26   Defendant's residence.   Defendant has not been prejudiced by the limitations placed on his cross-

27   examination to test the reliability of the informant because, as stated in the preceding section, the Court

28   bases its finding that the probation officers had reasonable suspicion of criminal activity on the totality

1   of the circumstances.

2        **3.**     <u>**Alleged Violation of Defendant's Miranda Rights.**</u>

3        Defendant argues that once he invoked his *Miranda* rights and advised the probation officers

4   that he did not want to make a statement and wished to consult with his attorney, all further

5   questioning of him should have ceased.  Defendant argues that the officers violated his *Miranda* rights

6   by questioning him further after the firearm was discovered and that the statements allegedly made by

7   him should be suppressed.

8        It is undisputed that at the commencement of the search, Defendant was placed in handcuffs

9   and informed of his *Miranda* rights by Probation Officer Simon.  It is also undisputed that Defendant

10   invoked his right to remain silent and to consult with his counsel before making any statement.  A

11   probation officer attempted to contact Defendant's counsel, but was unable to reach him.   During the

12   search, a firearm, ammunition and controlled substances were found in Defendant's residence.  A North

13   Las Vegas police sergeant thereafter made a statement to Mr. Lofton or in his presence that a gun had

14   been found.  The police sergeant who made the statement did not testify at the hearing.

15        Probation Officer Robert Aquino testified that the police officer did not direct his statement

16   about the gun to Defendant Lofton.  Probation Officer Pat Foy testified, however, that the police

17   sergeant spoke directly to Defendant Lofton.  According to Officer Foy, the police sergeant asked

18   Defendant Lofton if he remembered him to which Defendant responded that he did remember him.  The

19   police sergeant then either said to Defendant:  "Oh, so you got a gun here?" or said  "A gun was

20   located here."   Defendant did not say anything to the police sergeant in response to his question or

21   statement about a gun being found.  According to Officer Foy, there were no other questions or

22   statements by the police sergeant and none of the probation officers present asked any questions or

23   made any comment at that time.  Officer Foy testified that shortly after the police sergeant made his

24   statement, Defendant Lofton asked to speak to whomever was in charge.  Officer Foy testified that he

25   then contacted Officer Aquino, reminded him that Defendant Lofton had invoked his *Miranda* rights

26   and informed him that Defendant Lofton wished to speak to the officer in charge.  Based on the

27   foregoing, the Court finds that Officer Foy is a more reliable witness than Officer Aquino as to what

28   was said by the police sergeant to Defendant Lofton.

1    When a defendant invokes his right to remain silent, the admissibility of statements obtained

2  thereafter depends on whether the defendant's right to cut off questioning was "scrupulously honored."

3  *Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct.321 (1975).   Once a defendant invokes his right to

4  remain silent, further questioning should cease.   The Court held, however, that scrupulously honoring

5  the accused's right to cut off questioning does not preclude any and all subsequent questioning under

6  any and all circumstances.  The defendant in *Mosley* was advised of his rights and was initially

7  questioned about a crime.  During the interview, the defendant  invoked his right to remain silent and

8  the officer immediately ceased questioning.  The following day, another officer came to the jail to

9  question defendant about a different crime.  After again being fully informed of his right to remain

10  silent, the defendant made statements implicating himself in the crime. The Court held that the

11  questioning of Defendant on the second day about another crime did not violate his *Miranda* rights.

12    The proscription against further questioning by police officers is more stringent, however, when

13  the defendant also invokes his right to consult with counsel prior to further questioning.   In *Edwards v.*

14  *Arizona*, 451 U.S. 477, 484-486, 101 S.Ct. 1880 (1981), the Court held that once an accused invokes

15  his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be

16  established by showing only that the accused responded to further police-initiated custodial

17  interrogation, even if the accused has again been advised of his rights.  An accused who expresses his

18  desire to deal with the police only through counsel is not subject to further interrogation by the

19  authorities until counsel has been made available to him, unless the accused himself initiates further

20  communication, exchanges or conversations with the police.  *See also United States v. Moreno-Flores*,

21  33 F.3d 1164, 1170 (9th Cir. 1994).

22    In *Edwards,* the defendant initially made statements to the police after being advised of his

23  *Miranda* rights.  The defendant then stated that he wanted an attorney before he made a "deal" with the

24  police.  The officer ceased questioning at that time.  The following day, however, two other detectives

25  came to the jail and asked to see the defendant.  The guard told defendant that he had to speak with the

26  detectives.  The officers again informed defendant of his *Miranda* rights and then questioned him and

27  elicited incriminating statements from him.  Under these circumstances, the Court held that defendant

28  had not knowingly and intelligently waived his rights because defendant had not initiated any

1   communication with the authorities after invoking his right to counsel.

2       The issue in this case is whether Defendant Lofton was subjected to interrogation after he

3   invoked his rights to remain silent and to consult with counsel.  In *Rhode Island v. Innis*, 446 U.S. 291,

4   100 S.Ct. 1682 (1980), the defendant was arrested for murder, robbery and kidnaping.  After being

5   advised of his *Miranda* rights, the defendant stated that he wanted to speak with a lawyer.  While

6   defendant was being transported to jail in a patrol car, two of the officers engaged in conversation with

7   each other that a shotgun allegedly used by defendant in the crime had been hidden near a school for

8   handicapped children and expressed their concern that the gun might be found by one of the children

9   who could be hurt.  Upon hearing this conversation, defendant told the officers that he would show

10  them where he hid the gun.  The issue before the Court was whether the officers' statements to each

11  other in defendant's presence constituted interrogation of defendant.  In holding that the officers'

12  statements did not constitute improper interrogation in violation of defendant's invoked right of

13  counsel, the Court stated:

14          We conclude that the *Miranda* safeguards come into play whenever a
            person in custody is subjected to either express questioning or its
15          functional equivalent.  That is to say, the term "interrogation" under
            *Miranda* refers not only to express questioning, but also to any other
16          words or actions on the part of the police (other than those normally
            attendant to arrest and custody) that the police should know are
17          reasonably likely to elicit an incriminating response from the subject.
            The latter portion of this definition focuses primarily upon the
18          perceptions of the suspect, rather than the intent of the police.

19  *Id.*, 446 U.S., at 300-301.

20      The Court further stated that "the definition of interrogation can extend only to words or

21  actions on the part of the police officers that they *should have known* were reasonably likely to elicit an

22  incriminating response."  *Id.*  Based on this definition, the Court held that defendant was not subjected

23  to interrogation by virtue of the officers' statements to one another regarding their concerns about

24  where the shotgun might be hidden.  The Court noted that the conversation between the officers

25  "included no express questioning of the [defendant]."  *Id.,* at 302.  The Court also held that the

26  defendant was not subjected to the functional equivalent of questioning because it could not be said

27  that the officers should have known that their conversation was likely to elicit an incriminating response

28  from the defendant.  The Court noted that the entire conversation was brief and consisted of no more

23

1    than a few off hand remarks by the officers.  The Court also noted that there was no evidence that the

2    officers knew that defendant was "particularly susceptible to an appeal to his conscience concerning the

3    safety of handicapped children" or that the defendant was unusually disoriented or upset, such that they

4    should have known that their comments would elicit an incriminating response.  *Id.*

5        In *United States v. Moreno-Flores*, 33 F.3d 1164 (9th Cir. 1994), the defendant was arrested

6    on drug trafficking charges.  After defendant was advised of his *Miranda* rights and had invoked his

7    right to remain silent but not his right to consult with counsel, a federal agent told him that the agents

8    had seized 600 pounds of cocaine and that he was in serious trouble and facing a lengthy prison

9    sentence.  Defendant did not respond to these statements.  The following day, the agent picked up the

10    defendant from jail to transport him to court.  The agent asked defendant how his night was.  A few

11    minutes later, defendant made a statement incriminating himself.  The agent explained to defendant that

12    because he had invoked his right to remain silent the agent would not question him.  The defendant

13    thereupon made further incriminating statements.  The court held that the agent's statements that 600

14    pounds of cocaine had been seized and the defendant was in serious trouble and faced a lengthy prison

15    sentence did not constitute interrogation because the statements were not express questions; nor did

16    they constitute the functional equivalent of interrogation.

17        In support of this holding, the court in *Moreno-Flores* cited *Shedelbower v. Estelle*, 885 F.2d

18    570,573 (9th Cir. 1989).  In that case the defendant agreed to speak with the officers after being

19    advised of his *Miranda* rights.  During the course of the interview, however, defendant advised the

20    officers that he wished to consult with counsel before making any further statements.  Following this

21    invocation of his right to counsel, one of the officers told the suspect that his accomplice had been

22    arrested and that the victim had identified him. The latter statement was untrue.  The court held that the

23    officer's statements were not the type of comments that would encourage an accused to make some

24    spontaneous incriminating remark and, therefore, did not constitute interrogation after the defendant

25    had invoked his right to counsel.

26        The court in *Moreno-Flores* also noted that *Rhode Island v. Innis*, *supra,* excludes from the

27    definition of interrogation words or actions "normally attendant to arrest and custody."  It further

28    stated: "'This circuit has suggested that when an officer informs a defendant of circumstances which

1  contribute to an intelligent exercise of his judgment, this information may be considered normally

2  attendant to arrest and custody.' *United States v. Crisco*, 725 F.2d 1228, 1232 (9th Cir. ) (officer's

3  post-arrest statement to defendant about undercover officer previously showing defendant $60,000

4  with which he was to purchase cocaine was intended to inform defendant of circumstances and not to

5  elicit incriminating response), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984)."

6  The court held the agent's statements to Moreno-Flores, regarding the quantity of cocaine and the

7  seriousness of the charges against him, were attendant to arrest and custody and, therefore, did not

8  constitute interrogation.  The court also held that the officer's question to defendant the following day

9  as to how his night went was an innocuous question which the officer could not have foreseen would

10  elicit an incriminating response.

11  By contrast, in *United States v. Padilla*, 387 F.3d 1087 (9th Cir. 2004), the court held that the

12  statement made by an FBI agent to the defendant while in custody constituted interrogation.  The

13  defendant had not been advised of his *Miranda* rights.  The agent advised defendant of the federal

14  charges against him and told him he was being taken to make his initial appearance before the

15  magistrate judge.  The agent said something to the effect that this was his "last chance to cooperate" in

16  the investigation of another criminal suspect.   In response to this statement, the defendant made

17  incriminating statements.  The court held that the agent's "last chance to cooperate" statement

18  constituted interrogation because the agent should have known that it was reasonably likely to elicit an

19  incriminating response.  The court noted that it was difficult to imagine any purpose for such a

20  statement other than to elicit a response.

21  In this case, Officer Foy was somewhat uncertain as to whether the North Las Vegas police

22  sergeant spoke to Defendant in the form of question or instead made a declaratory statement.

23  According to Officer Foy, the police sergeant either said  "Oh, so you got a gun here?" or said  "A gun

24  was located here."  In the latter instance, the Court would conclude that the police officer's statement,

25  like the statements in *Moreno-Flores* and *Crisco, supra,* was made attendant to arrest and custody and,

26  therefore, was not interrogation.  If, however, the police sergeant made the statement in the form of

27  question directed to Mr. Lofton and Defendant Lofton had responded to the police officer, then it

28  would more likely constitute interrogation because it was in the form of an express question likely to

25

1  elicit a response – even if the police sergeant's subjective intent was only rhetorical.

2        The police sergeant's single question or statement "Oh, so you got a gun here?" did not,

3  however, elicit any immediate response from Defendant Lofton.   Nor is there any evidence that the

4  police sergeant or any other officers asked any further questions or made any follow-up statements that

5  would appear likely to have elicited a response from Defendant Lofton.   The fact that Defendant did

6  not immediately respond to the police sergeant's statement is also a factor in determining whether it

7  constitutes interrogation or whether that statement or question initiated interrogation of the Defendant

8  in violation of his invoked right to consult with counsel.   *Shedelbower v. Estelle*, 885 F.2d 570 (9th

9  Cir. 1989).

10        After the police sergeant made the statement or question, Defendant Lofton asked Officer Foy

11  if he could speak to the person in charge of the search.   Officer Aquino then spoke to the Defendant

12  and informed him that he would not ask him any questions because he had invoked his rights to remain

13  silent and/or consult with counsel.   Despite having been so advised, Defendant expressed his

14  willingness to make a statement and answer the officer's question.   Officer Aquino asked Defendant if

15  he wanted to speak with the BATF agents and Defendant said he did.   BATF Agent Dyer then came to

16  Defendant and asked him if it was true that he wanted to talk to the agent.   According to agent Dyer,

17  Defendant responded yes.   Agent Dyer then read the complete *Miranda* warnings to Defendant

18  Lofton.   Defendant acknowledged that he understood his rights and agreed to waive them.[4]

19        In *Shedelbower v. Estelle, supra,* the court held that the officer's initial statements to the

20  defendant were not an invitation to further discuss the matter.   The court also noted that after

21  defendant informed the officers that he wished to make a statement, the officers told him that they were

22

23  _____

24        [4]Given the circumstances and the number of probation officers and law enforcement officers
    present, it would have been arguably safe and advisable for Defendant's handcuffs to have been briefly

25  removed so that he could have executed the written waiver of his *Miranda* rights to clearly confirm
    that he did, in fact, waive his rights.   Based on the generally consistent and credible testimony of

26  Officer Foy, Officer Aquino and Agent Dyer, however, the Court finds that prior to any statement
    being made by Defendant Lofton, he was again fully informed of his *Miranda* rights and agreed to

27  waive them before he made any incriminating statement.

28

1   prohibited from talking to him any further because he had invoked his right to an attorney.  The officers

2   then spoke to the district attorney and gave a further *Miranda* warning to defendant to assure that he

3   really wanted to discuss the matter without the presence of counsel.  The court, therefore, held that the

4   officers' initial statements, even if viewed as interrogation, did not vitiate the voluntariness of

5   Defendant's subsequent requests to speak with the officers and to make a statement.

6        Here, the police sergeant made a brief statement to Defendant Lofton, arguably in the form of a

7   question regarding a gun being found in the residence.  The Defendant did not respond to the police

8   officer.   Shortly thereafter, however, Defendant informed Probation Officer Foy that he wanted to

9   speak to the person in charge.  Defendant on three occasions initiated communication or voluntarily

10  expressed his willingness to make a statement –  first to Officer Foy, then to Officer Aquino and finally

11  to agent Dyer.  Defendant was informed by Officer Aquino that he would not ask him questions

12  because he had invoked his rights, but that he would summon the BATF agents if Defendant wanted to

13  talk to them.  Despite being so advised, Defendant stated that he wanted to make a statement.  BATF

14  Agent Dyer then also asked Defendant if he wanted to make a statement, to which he responded

15  affirmatively.  The agent then read the *Miranda* rights to him before obtaining his statement.  Given the

16  brevity of the police sergeant's statement, which may or may not have been expressed in the form of a

17  question, the fact that Defendant did not immediately respond to the police officer, and the subsequent

18  events, the Court concludes that Defendant was not subjected to interrogation by the officers after he

19  invoked his right to counsel.  Under these circumstances, Defendant initiated further contact with the

20  officers for the apparent purpose of explaining the presence of the gun in the residence.  The Court

21  finds that Defendant Lofton knowingly and intelligently waived his right to remain silent and to consult

22  with counsel.

23                              <u>**CONCLUSION**</u>

24       The Court finds that the search of Defendant's residence was supported by reasonable suspicion

25  that he was engaged in criminal activity and the search, therefore, did not violate the Fourth

26  Amendment.  The Court also finds that Defendant's statements to BATF Agent Dyer did not violate his

27  rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966) and *Edwards v. Arizona*, 451

28  U.S. 477, 484-486, 101 S.Ct. 1880 (1981).

## RECOMMENDATION

**IT IS RECOMMENDED** that Defendant Dante Lamont Lofton's Motion to Suppress (#23) be DENIED.

### NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within ten (10) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 27th day of February, 2006.

_____
**GEORGE FOLEY, JR.**
**UNITED STATES MAGISTRATE JUDGE**

28